**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CHILD & FAMILY RESOURCES, INC.,
2800 E. Broadway Blvd.
Tucson, AZ 85716,

Plaintiff,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES,
200 Independence Ave., NW
Washington, DC 20201,

and

ALEX AZAR, Secretary,
Department of Health and Human Services,
200 Independence Ave., SW
Washington, DC 20201

Defendants.

Civil Action No. 1:18-cv-01042

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. The Teen Pregnancy Prevention Program (TPPP) is a congressionally mandated program that funds evidence-based programs to prevent teen pregnancy. When created by statute in 2009, TPPP was a major shift away from the abstinence-only approach to pregnancy prevention that had been federal policy for decades and towards an evidence-based approach focused on funding programs that could demonstrate success, regardless of methodology.

2. Plaintiff Child & Family Resources, Inc. (CFR) is among the recipients of 81 five-year TPPP grants awarded in 2015 by the Office of Adolescent Health (OAH), an office within the Department of Health and Human Services (HHS). In May 2017, HHS announced that it wanted to terminate the TPPP in the next fiscal year and sought no funding for the program in its 2018 budget request to Congress. HHS then informed all TPPP grantees that their grants would be terminated effective June 2018—two years ahead of the scheduled end dates. Despite HHS's request to zero-out funding for the TPPP, Congress appropriated funds to continue the program through federal fiscal year 2018. Congress included a TPPP appropriation in the Consolidated Appropriations Act, 2018, which was signed into law on March 23, 2018.

3. HHS's termination of the grants in a manner contrary to HHS regulations and its failure to provide a reasoned basis for the termination of plaintiff's grants constitutes final agency action that is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act (APA).

4. Plaintiff is replicating proven evidence-based pregnancy prevention programs and engaged in empirical research of new and innovative pregnancy prevention programs. The unlawful termination of plaintiff's grants threatens the viability of its programs, including by preventing plaintiff from completing its research, and will harm the communities it serves. Plaintiff thus brings this action to enjoin HHS from terminating its grants and the TPPP.

## JURISDICTION AND VENUE

5.   Venue is proper in this district because a substantial part of the acts or omissions giving rise to the claim occurred in this judicial district. 28 U.S.C. § 1391(e).

6.   This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1361, 28 U.S.C. § 2201, and 5 U.S.C. § 702.

## PARTIES

7.   Plaintiff CFR is a community-based, non-profit organization with a long history of building community collaborations that address unmet needs and gaps in social services. CFR uses effective prevention and education strategies with families, teens, and early educators to build strong communities in which children can reach their full potential.

8.   CFR is the recipient of one Tier 1B five-year grant for $863,492 and one Tier 2B five-year grant for $541,339 annually. CFR uses these grants to conduct a high-quality rigorous evaluation of a teen pregnancy prevention program, Guy Talk, and to implement a separate teen pregnancy prevention program, Mobilization for Positive Futures.

9.   CFR's Tier 2B funding in Southern Arizona supports the rigorous evaluation of Guy Talk, a broad-based, technology-supported primary prevention program designed to help adolescent boys build skills they need to make good life choices and resist risky behaviors, including risky sexual behavior. Guy Talk addresses strategies to reduce risk for pregnancy and sexually-transmitted infections, and to address related issues such as life goals, peer groups, leadership, body image and development, role expectations, and consent etiquette. Guy Talk also addresses gender-specific differences in risk factors facing adolescent boys, who engage in early sexual intercourse at higher rates than girls across race/ethnicities and for whom aggressive behavior is consistently found to be higher than for girls. CFR's TPPP-funded program evaluates

a randomized control trial to determine whether the program is effective at reducing teen pregnancies by empowering young men to take an active role in healthy relationships, birth control, and consent.

10. CFR's Tier 1B funding in the Tucson area supports Mobilization for Positive Futures, which focuses on in-school youths and their parents, in areas of highest need. Mobilization for Positive Futures is a large-scale implementation of programs already proven to reduce teen pregnancy and risky behaviors that lead to teen pregnancy. Mobilization for Positive Futures serves 2,000-2,500 students in a school district with teen birth rates roughly three times the national average. Through this program, CFR helps schools develop sexual education curricula and teach both abstinence and protection methods to teenagers.

11. Defendant HHS is the agency of the federal government of the United States responsible for administering the TPPP. HHS is an agency within the meaning of the APA.

12. Defendant Alex Azar is the Secretary of HHS and the agency's highest-ranking official. Plaintiff sues Secretary Azar in his official capacity.

## BACKGROUND

### Creation of the TPPP

13. In 2009, alarmed that teenage pregnancy rates had begun to rise after years of decline, Congress mandated the creation of the TPPP, an evidence-based initiative to reduce teen pregnancy. Specifically, in the Consolidated Appropriations Act, 2010, Congress appropriated $110 million to HHS for fiscal year 2010 and mandated that the funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants." Pub. L. No. 111-117, div. D, tit. II, 123 Stat. 3034, 3253.

14. Congress specified that HHS must expend the appropriated funds across two "tiers" of grants:

- **Tier 1:** Congress mandated that "not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors."

- **Tier 2:** Congress mandated that "not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy."

*Id.*

15. Congress specified that "any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities," and that "$4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches." *Id.*

16. Congress directed the program to be administered within the Office of the Assistant Secretary of Health by OAH. OAH is responsible for implementing and administering the program and coordinates its efforts with the Administration for Children and Families, CDC, and other appropriate HHS offices and operating divisions. Conference Rep. No. 111-366, at 1043 (2009).

17. From 2009 through the present, Congress has mandated the continuation of the TPPP and has appropriated funds to HHS to administer the program for each fiscal year using similar appropriations language. Congress appropriated funds as follows:

| Fiscal Year | TPPP Funding | Evaluation Funds |
|---|---|---|
| 2010 | $110M | $4.5M |
| 2011 | $104.8M | $4.4M |

| | | |
|---|---|---|
| 2012 | $104.8M | $8.5M |
| 2013 | $98.4M | $8.5M |
| 2014 | $101M | $8.5M |
| 2015 | $101M | $6.8M |
| 2016 | $101M | $6.8M |
| 2017 | $101M | $6.8M |
| 2018 | $101M | $6.8M |

18. On March 23, 2018, Congress passed the Consolidated Appropriations Act, 2018, which fully funded the TPPP for fiscal year 2018. Congress directed that the appropriated funds "shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants." Consolidated Appropriations Act, 2018, Pub. L. No. 115-41. Congress further directed that "not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." *Id.*

**HHS's Administration of the TPPP from 2010 through 2016**

19. Consistent with Congress's mandate and appropriations, in 2010, HHS, through OAH, prepared to provide $75 million in funding to Tier 1 programs that aim to replicate evidence-based programs and $25 million to Tier 2 programs that aim to develop new and innovative evidence-based programs.

20. Prior to awarding the first Tier 1 grants replicating evidence-based programs, HHS undertook an intensive evidence review process to identify programs that had documented positive impacts on teen pregnancy prevention and other associated factors, and would thus be eligible for TPPP funding. Under a contract with HHS, Mathematica Policy Research conducted an independent, systematic review of the evidence base on teen pregnancy, sexually transmitted infections, and sexual risk behaviors. This review defined the criteria for the quality of an evaluation study and the strength of evidence for a particular intervention. Based on these criteria, HHS defined a set of rigorous standards an evaluation must meet in order for a program to be considered "effective based on rigorous evaluation."

21. Based on the review, HHS compiled a list of evidence-based program models that it deemed to have met those standards. The list included programs that use a number of approaches—sexual health education, youth development, abstinence-based, and programs for delivery in clinical settings and for special populations. Under the TPPP, federal funding moved from being focused on a particular type of sex education based on a certain ideology to evidence-based programs that included a variety of approaches determined to be "effective based on rigorous evaluation."

22. Since the program's inception, HHS has provided funding to Tier 1 and Tier 2 programs for five-year project periods.

23. In April 2010, HHS, through OAH, issued two separate Funding Opportunity Announcements (FOAs) for Tier 1 and Tier 2 cooperative agreements. A cooperative agreement is an award instrument with substantial collaboration between the awarding agency and the recipient. OAH stated that it chose to use cooperative agreements to provide for close collaboration with recipients, ensure adherence to project aims, enable review and approval of

curricula and educational materials, and assist with ongoing technical assistance and troubleshooting.

24. In the first cohort, between FY 2010 and FY 2014 (September 2010 to August 2015), HHS funded 102 grant projects that reached approximately half a million youth, trained more than 6,800 professionals, and established partnerships with over 3,800 community-based organizations across the United States.

25. A key aspect of the TPPP is rigorous evaluation of the funded programs to determine whether the replicated evidence-based models (Tier 1) and the new, innovative strategies (Tier 2) are effective. As part of the evaluation of the first cohort of grants, HHS funded 41 independent evaluation studies to assess where, when, and with whom programs are most effective. Of the 41 programs evaluated, HHS found four of the Tier 1 evidence-based programs to be effective in changing behavior when they were applied in new settings or with new populations than where they first showed behavioral impact, and many more programs reported changing participants' knowledge, attitudes, and intentions to avoid risky behaviors. HHS also found that eight of the Tier 2 new and innovative programs showed an impact on behaviors that prevent teen pregnancy and met the criteria to be considered an HHS evidence-based program in the future. The ratio of evaluations that produced positive results exceeded what experts typically expect from rigorous replications of social programs.

26. In addition, HHS conducted its own complementary evaluation activities. One of the federal evaluation studies, the TPPP Replication Study, examined whether program models that were commonly chosen by TPPP grantees and widely used in the field could achieve impacts with different populations and settings.

27. In early 2015, HHS, through OAH, issued new FOAs for a second five-year cohort of cooperative agreements, this time further specializing the FOAs within the two tiers. As mandated by Congress, the Tier 1 FOAs sought applicants for grants to replicate evidence-based programs that HHS previously determined had been proven effective and the Tier 2 FOAs sought applicants for grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy:

- **Tier 1A – Capacity Building to Support Replication of Evidence-Based Teen Pregnancy Prevention Programs**: "The goal of this FOA is to fund intermediary organizations to provide capacity building assistance (CBA) to at least 3 youth-serving organizations to replicate evidence-based TPP programs in a defined service area with demonstrated need." Tier 1A FOA, at 3-4, https://www.hhs.gov/ash/oah/sites/default/files/tier1a-foafile.pdf.

- **Tier 1B – Replicating Evidence-Based Teen Pregnancy Prevention Programs to Scale in Communities with the Greatest Need**: "The goal of this FOA is to have a significant impact on reducing rates of teen pregnancy and existing disparities by replicating evidence-based TPP programs to scale in at least 3 settings in communities and with populations at greatest need." Tier 1B FOA, at 3, https://www.hhs.gov/ash/oah/sites/default/files/tier1b- foafile.pdf.

- **Tier 2A – Supporting New or Innovative Approaches**: "The overall goal of this FOA … is to enable and support early innovation to advance adolescent health and prevent teen pregnancy." Tier 2A FOA, at 4, https://www.hhs.gov/ash/oah/sites/default/files/tier2a-foafile.pdf.

- **Tier 2B – Rigorous Evaluation of New or Innovative Approaches**: "The purpose of this FOA is to increase the number of evidence-based TPP interventions available by rigorously evaluating new or innovative approaches for preventing teen pregnancy and related high-risk behaviors." Tier 2B FOA, at 3, https://www.hhs.gov/ash/oah/sites/default/files/tier2b-foafile.pdf.

28. The FOAs provided that the five-year project periods for the grants would be funded in annual increments (budget periods) and that funding for all budget periods beyond the first year of the grant would be "contingent upon the availability of funds, satisfactory progress of the project, and adequate stewardship of Federal funds." The FOAs further provided for grantees to submit noncompeting applications in each year of the approved project period,

providing progress reports for the current budget year, work plans, budgets, and budget justifications for the upcoming year. *See, e.g.*, Tier 1B FOA, at 39, https://www.hhs.gov/ash/oah/u sites/default/files/tier1b-foafile.pdf.

29. After reviewing nearly 500 applicants, in July 2015, HHS awarded grants to 81 organizations across Tiers 1 and 2. Combined, the chosen programs were designed to serve more than 1.2 million youth across 38 states over the five-year grant period. In October 2015, HHS awarded three additional grants under Tier 2C: "New Approaches for Young Males."

30. Eight organizations received Tier 1A grants to help communities build capacity to implement and evaluate programs for populations with teen birth rates well above the national average and with organizations serving youth in juvenile detention and foster care or who are homeless or young parents.

31. Fifty organizations received Tier 1B grants to replicate evidence-based programs in multiple settings in communities where teen birth rates are significantly higher than the national average. The approved programs were implemented in multiple settings, including schools, clinics, and community-based settings in both urban and rural areas, and with the objective of reaching especially vulnerable youth, including youth in foster care, youth in juvenile detention, expectant and parenting teens, and older youth. The programs were designed to provide medically accurate, age appropriate, evidence-based programs to the youth in the communities where the programs operate. Plaintiff CFR received a Tier 1B grant.

32. Two organizations received Tier 2A grants to support early innovation to prevent teen pregnancy, with one focused on technology-based innovations and one focused on program innovations. Each grantee would hold a national competition to select between five to fifteen

innovators who would receive funding to develop, test, and refine innovative products, programs, and/or processes to advance adolescent health and prevent teen pregnancy.

33. Twenty-one organizations received Tier 2B grants to rigorously evaluate new or innovative approaches for preventing teen pregnancy and related risk behaviors, focusing on developing interventions that will fill gaps in the existing evidence and work to reduce disparities. Plaintiff CFR received a Tier 2B grant.

34. Consistent with the FOAs, plaintiff's initial notices of award provided that the "project period" for each of its grants was five years, from July 1, 2015, through June 30, 2020. Within the project period were five "budget periods," running from July 1 to June 30 of the following year. The first notice of award was for the budget period from July 1, 2015, through June 30, 2016.

35. In June 2016, plaintiff received notices of award of the funds for the budget period from July 1, 2016, through June 30, 2017. Like the 2015 notices, the 2016 notices of award provided that the project period was through June 30, 2020.

36. In early July 2017, plaintiff received notices of award providing the full funding that had been appropriated in fiscal year 2017 for its third grant year.

37. Consistent with program requirements, each year of the project period of its grants, plaintiff submitted non-competing continuation applications for the next budget period and the required progress reports.

38. Plaintiff has complied with all TPPP requirements throughout the project period of the grants.

39. Through the present, OAH's reviews of plaintiff's progress reports and continuation applications included many commendations for its work. To the extent the reviews

included recommendations for improvements moving forward, plaintiff incorporated the agency's recommendations into its programs.

**HHS's Decision to Terminate the TPPP**

40. Shortly after the election of President Trump in November 2016, advocates for abstinence-only education to prevent teen pregnancy expressed their hope that the new administration would focus exclusively on abstinence-only education, as opposed to the TPPP's evidence-based programs with diverse methodologies.

41. On May 5, 2017, the President signed the Consolidated Appropriations Act, 2017, which fully funded the TPPP grants for the third grant year, from July 1, 2017, to June 30, 2018.

42. In May 2017, as part of the annual budgeting process, HHS submitted its budget request to Congress for the next fiscal year. In that request, HHS stated that "[t]he FY 2018 President's Budget does not request funds for this program" and "HHS will not make amounts available for Teenage Pregnancy Prevention activities in FY 2018." The request summarized the decision as follows: "The FY 2018 President's Budget request is $0.00, a decrease of $100,808,000 from [] FY 2017 …. The Budget eliminates the TPP program. The teenage pregnancy rate has declined significantly over recent years, but it does not appear this program has been a major driver in that reduction."

43. On June 5, 2017, Valerie Huber was appointed chief of staff to the Assistant Secretary for Health, who oversees the OAH and, in turn, the TPPP. From 2007 until her appointment to HHS, Huber served as president and CEO for Ascend, formerly known as the National Abstinence Education Association. She previously served as abstinence education coordinator for the state of Ohio. In April 2017, Huber wrote an editorial arguing that the TPPP was a failure that wasted taxpayer money while promoting teenage sex. In May 2017, after the administration released its proposed budget, Ascend issued a press release calling TPPP "an

approach that typically normalizes teen sex and which government research revealed was an abject failure," and quoted Huber as praising the President's request that Congress maintain funding for abstinence education while terminating the TPPP. In January 2018, Huber was appointed acting deputy assistant secretary for the HHS Office of Population Affairs, which does not oversee the TPPP program.

44. In early July 2017, when plaintiff received its notices of award for its third grant year, HHS informed plaintiff that its TPPP funding would terminate two years early, on June 30, 2018. The notices included only a single sentence informing plaintiff that its awards were being terminated: "This award also shortens the project period to end on June 30, 2018 at the end of this budget year." Upon information and belief, all TPPP grantees received similar notices of award with identical language terminating the five-year project period two years early.

45. In October 2017, upon information and belief, the three Tier 2C project grantees received similar notices indicating the shortening of their five-year project periods to three years.

46. HHS did not give the grantees prior notice that the awards would be prematurely terminated.

47. On July 17, 2017, a spokesperson for the Office of the Assistant Secretary for Health confirmed in an email to a reporter that the TPPP grants had been terminated based on President's fiscal year 2018 budget request to eliminate the program: "[T]he President's FY 2018 Budget eliminated funding for the Teen Pregnancy Prevention Program, so our grants office informed the grantees of their June 30, 2018 end date, to give them an opportunity to adjust their programs and plan for an orderly closeout." Megan Molteni, *Teen Pregnancy Researchers Regroup After Trump's HHS Pulls Funding*, Wired (July 19, 2017 7:00 am),

https://www.wired.com/story/teen-pregnancy-researchers-regroup-after-trumps-hhs-pulls-funding/.

48. On August 17, 2017, HHS released a statement to CNN stating, "The poor evaluation results [from the first cohort of grants] were the reason that the Trump Administration, in its FY 2018 budget proposal, did not recommend continued funding for the TPP program and HHS hit the pause button on it." Jacqueline Howard, *Why the Trump Administration is Cutting Teen Pregnancy Prevention Funding*, CNN (Aug. 17, 2017 8:58 am), https://www.cnn.com/2017/08/17/health/teen-pregnancy-prevention-programs-funding/index.html.

49. Congress expressly provided that the purpose of the TPPP is to replicate evidence-based programs and develop innovative approaches, conduct studies of those programs and approaches to determine which are effective, and then use the knowledge from those studies to inform current and future projects. Conference Rep. No. 111-366, at 1042-43 (2009); H.R. Rep. No. 111-220, at 176 (2009); S. Rep. No. 111-66, at 160 (2009). In seeking to terminate the existing grants, HHS has thwarted Congress's objective of enabling HHS to learn from the results of the programs, both positive and negative.

50. Based on the first round of evaluation results, OAH encouraged grantees to shift to the more effective models. Thus, the models that current grantees are implementing are different and stronger than the mix of models used in the first cohort.

51. TPPP has been recognized by bipartisan experts as an outstanding example of how to build evidence and administer a high-quality evidence-based program.

52. In late July 2017, 148 members of the House and thirty-four Senators sent letters to then-Secretary Price inquiring into HHS's decision to shorten all of the TPPP grants despite

ongoing congressional funding for the program. After HHS provided an incomplete response, in late November 2017, 27 Senators wrote again to Acting Secretary Hargan to express their concerns.

53.     On February 12, 2018, the President released his budget for fiscal year 2019. The budget in brief for HHS includes no funding for the TPPP, and further provides that "[t]he Budget does not include funding for new grants in the Office of the Assistant Secretary for Health." *See* FY 2019 Budget in Brief, at 115, https://www.hhs.gov/sites/default/files/fy-2019-budget-in- brief.pdf.

**Effect of Termination on Plaintiff's Projects**

54.     Plaintiff has been unable to obtain alternative sources of funding to offset the loss of funding from the TPPP grants.

55.     Without the TPPP grants, plaintiff will be unable to continue or complete its funded programs.

56.     Plaintiff is in the middle of a five-year individual randomized controlled trial for Guy Talk. Plaintiff has already seen positive results with the roughly 300 youths this program has served. As part of its evaluation program, plaintiff had intended to follow program participants for 12 months, into their sophomore year of college, to examine differences in sexual risk behavior. If plaintiff's grant is terminated, plaintiff will have insufficient data to conduct impact evaluations of the interventions studied. The termination of plaintiff's grant will greatly limit the benefits and value of its work and will force it to revise the scope of its program.

57.     Plaintiff is also in the middle of its five-year Mobilization for Positive Futures programming. Plaintiff had planned to train school staff at the district level to enable them to provide sexual health teacher training for years to come. The termination of plaintiff's grant will

likely end this program and limit the program's value and effectiveness, as plaintiff will likely be forced to resort to a less sustainable option.

58. The loss in funding will also require plaintiff to make staffing decisions and to begin the process of winding down their programs almost immediately.

59. In prior years, HHS has required TPPP grantees, including plaintiff, to submit their non-competing continuation applications for the next budget period in April. HHS must accept and process these materials for grantees to be eligible to receive funds for the upcoming budget year.

60. Plaintiff has submitted its non-competing continuation applications for the next budget period, as required under the terms of its grants. Upon information and belief, HHS is not accepting or processing plaintiff's continuation applications for the next budget year, which absent HHS's termination would begin on July 1, 2018.

**Numerous Courts, Including This Court, Have Held That HHS's Early Termination of TPPP Grants Violates the Administrative Procedure Act**

61. In recent months, several similarly situated TPPP grantees have filed lawsuits against HHS challenging HHS's decision to end their grant awards early in violation of HHS's termination regulations and without meaningful explanation. Judge Ketanji Brown Jackson of this Court, Judge Catherine Blake of the U.S. District Court for the District of Maryland, and Chief Judge Thomas Rice of the U.S, District Court for the Eastern District of Washington entered judgment in these parallel cases in favor of the plaintiff-grantees, holding that HHS's actions in terminating the TPPP two years before the established project period violates the APA.

62. On April 19, 2018, Judge Jackson granted the plaintiff grantees' motion for summary judgment, vacating HHS's decision to shorten the project period for plaintiff-grantees' projects and ordering HHS to accept and process plaintiff-grantees' applications as if it had not

terminated their federal awards. *Policy and Research, LLC v. Department of Health and Human Services*, No. 18-CV-346-KBJ (D.D.C. April 19, 2018).

63. On April 24, 2018, Chief Judge Thomas O. Rice in the Eastern District of Washington granted a permanent injunction for the plaintiff-grantees, finding that HHS's termination of plaintiffs' grants violated HHS regulations, the APA, and the Due Process Clause. Judge Rice's order requires HHS to accept and process the plaintiff-grantees non-competing continuing applications for the fourth budget period. *Healthy Teen Network, et al. v. Alex M. Azar II, et. al,* No. 18-CV-468-CCB (E.D. Wash. April 25, 2018).

64. On April 25, 2018, Judge Catherine C. Blake in the District of Maryland granted plaintiff-grantees' motion for summary judgment, holding that HHS's action was an improper termination under the agency's regulations or, in the alternative, an unlawful arbitrary and capricious decision, in violation of the APA. Accordingly, Judge Blake ordered HHS to process the plaintiffs' non-competing applications. *Planned Parenthood of Greater Washington and North Idaho, et. al. v. Department of Health and Human Services,* No. 2:18-CV-55-TOR (D. Md. April 24, 2018).

**CAUSE OF ACTION**

**(Administrative Procedure Act – Unlawful Termination of Grants)**

65. The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

66. Defendants' termination of plaintiff's grants constitutes final agency action under the APA.

67. HHS's grant regulations set forth specific reasons why HHS may terminate an award prior to the end of the period for which a grant has been programmatically approved:

(1) "if the non–Federal entity fails to comply with the terms and conditions of the award"; (2) "for cause"; or (3) "with the consent of the non–Federal entity." 45 C.F.R. § 75.372(a).

68. HHS terminated plaintiff's TPPP grants without explanation and that termination was contrary to HHS regulations providing the allowable reasons for termination.

69. Defendants' termination of plaintiff's grants was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that this Court:

(A) Declare defendants' termination of plaintiff's TPPP grants unlawful;

(B) Enjoin defendants to reinstate plaintiff's TPPP grants for the awarded five-year project period and to continue to administer the grants to the same extent and in the same manner as prior to the unlawful termination, as provided in the notices of award and HHS regulations;

(C) Award plaintiff its costs and reasonable attorneys' fees; and

(D) Grant such other relief as this Court may deem just and proper.

Dated: May 2, 2018

Respectfully submitted,

/s/ *April N. Ross*

April N. Ross (D.C. Bar No. 500488)
aross@crowell.com
Christopher Flynn (D.C. Bar No. 446235)
cflynn@crowell.com
Marie S. Dennis (D.C. Bar No. 474209)
mdennis@crowell.com

CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116

*Counsel for Plaintiff*